

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| NORTH ALABAMA BANK, | ] |
| | ] |
| Plaintiff(s), | ] |
| | ] |
| vs. | ] CV-03-CO-00298-NE |
| | ] |
| BANCINSURE, INC., et al., | ] |
| | ] |
| Defendant(s). | ] |

MEMORANDUM OF OPINION

I.   INTRODUCTION.

The plaintiff, North Alabama Bank ("NAB"), filed suit in the Circuit Court of Madison County, Alabama, on January 15, 2003, against defendants, BancInsure, Inc. ("BancInsure"), Reliance Insurance Company ("Reliance"), and Travelers Casualty and Surety Company ("Travelers") for breach of contract and failure to indemnify NAB for certain financial losses it incurred as a result of an illegal check kiting scheme and a fraudulently obtained loan.[1] Defendants Reliance and Travelers, with the consent of BancInsure,

---

[1] In its response to Travelers' motion for summary judgment, NAB conceded all claims associated with a loss relating to the check kiting scheme. [Pl.'s Br. Opp'n. at



removed the action based on diversity of citizenship. Travelers subsequently filed a motion asserting that summary judgment is due to be granted on NAB's claims. [Doc. # 50.] The issues have been fully briefed by both parties and are now ripe for decision. Upon due consideration and for the reasons set out below, the motion will be granted.

II.     FACTS.[2]

The defendant, Travelers, issued a Financial Institution Bond ("FIB") to NAB in August 1998, insuring NAB for certain losses it may suffer under insuring agreements as set forth in the bond. [Compl. ¶ 5.] The Bond stated in pertinent part:

---

1.] Therefore, the court will only address NAB's claims regarding its loss due to a fraudulently obtained loan. Furthermore, Travelers assumed all duties and obligations of Reliance under the Financial Institutional Bond issued to NAB. Reliance was dismissed from this action on August 25, 2003. [Doc. # 20.]

[2]The facts set out below are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. See Info. Sys. & Networks Corp. v. City of Atlanta, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts. See Cox v. Adm'r U.S. SteEl & Carnegie Pension Fund, 17 F.3d 1386, 1400 (11th Cir. 1994).

> **"FIDELITY"**
> (A) Loss resulting directly from dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others. Such dishonest or fraudulent acts must be committed by an Employee with the manifest intent:
>
> > (a) to cause the Insured to sustain such loss; and
> > (b) to obtain financial benefit for the Employee or another person or entity.
>
> However, if some or all of the insured's loss results directly or indirectly from Loans, that portion of the loss is not covered unless the Employee was in collusion with one or more parties to the transactions and has received, in connection therewith, a financial benefit . . . .

[Pl.'s Ex. 1.]

On August 28, 1999, NAB, through its Vice President and loan officer, Bryant Hovis, made a loan to an individual, Gregory Steenson ("Steenson"), in the amount of $1,500,000.00. [Compl. ¶ 5.] In December 1999, NAB was required by the FDIC to charge off the Steenson loan due to problems with loan documentation. [Pl.'s Ex. 20.] NAB's Bond with Traveler's was in effect until December 31, 1999. [Pl.'s Br. Opp'n at 10.]

In January 2000, BancInsure issued to NAB a Financial Institution Bond with a "Fidelity" clause identical to that of Travelers. In its January 2000, application to BancInsure, which was signed by NAB President Al Smith, NAB

certified that no director or officer of the bank had any knowledge of a pending loss or any information that could give rise to a claim under the Bond. [Def.'s Ex. G.] In its BancInsure Interim Anniversary Questionnaire, dated December 20, 2000, NAB stated that there was no situation not yet reported which may lead to a claim under the insurance. [Def.'s Ex. I.]

In January 2000 and January 2001, NAB's Board of Directors approved the re-appointment of Bryant Hovis as Vice President of NAB. [Smith Dep. at 92-96; Def.'s Ex. E.] Prior to Bryant Hovis' resignation in October 2001, neither the Board of Directors nor law enforcement were informed that Hovis may have participated in criminal activity regarding the Steenson loans. [Smith Dep. at 88-89, 92-96; Def.'s Ex. E.] NAB President, Al Smith, testified that he would have informed the Board had he suspected Hovis of criminal activity. [Smith Dep. at 88-89; Def.'s Ex. E.] Hovis was not disciplined for any criminal or dishonest activity while employed as Vice President at NAB. [Smith Dep. at 36-38; Def.'s Ex. E.] It was not until November 7, 2001, after Hovis' resignation, that NAB issued a Suspicious Activity Report ("SAR"). This is the first and only SAR issued by NAB listing

Hovis as a suspect. It addressed check-kiting activity but not any dishonest activity regarding the Steenson loans. [Def.'s Ex. R.]

The Bank, another financial institution, sent a letter to NAB concerning its possible claims against NAB regarding the check-kiting scheme. In NAB's response, counsel for NAB stated that the Bank's contention that Hovis participated in the check kiting scheme was "a false statement" and "libelous per se." [Def.'s Ex. L.] This letter was read and approved beforehand by NAB President Smith. [Smith Dep. at 56-57; Def.'s Ex. E.]

On August 30, 2002, Bryant Hovis was indicted in the United States District Court for the Northern District of Alabama, in a multi-count indictment. On October 30, 2002, Hovis entered a guilty plea to:

> unlawfully, knowingly and willfully conspir[ing] and agree[ing] with other persons: (a) to execute and attempt to execute a scheme and artifice to defraud North Alabama Bank and other financial institutions ... and (b) to knowingly and wilfully [sic] make a false material statement and report upon a loan application, for the purpose of influencing the actions of North Alabama Bank ...

[Pl.'s Ex. 17.]

On September 3, 2002, plaintiff's counsel wrote to counsel for BancInsure stating:

> However, our client adamantly denies that it had any knowledge of the check-kiting scheme on or before late August, 1999. In addition, it had no knowledge nor had it discovered any loss at that time as defined under the Financial Institution Bond issued by your client.... Such losses, as may be incurred, were not discovered until after January 1, 2000, the effective date of the Financial Institution Bond issued by your insured. It would be fair to say that the losses were discovered at the time suits were filed by The Bank and Community Spirit Bank.

[Def.'s Ex. B.][3]

On November 20, 2002, Travelers denied NAB's claim for losses associated with the Steenson loan, stating that NAB did not discover this loss during the Traveler's Bond period. [Pl.'s Ex. 13.] On October 16, 2002, BancInsure also denied NAB's claims, stating that discovery of the loss occurred before BancInsure's Bond period. [Pl.'s Ex. 11.] Discovery is defined in both policies as:

> Section 3. This bond applies to loss discovered by the Insured during the Bond Period. Discovery occurs when the Insured first becomes aware of facts which would cause a reasonable person to assume that a loss of a type covered by this bond had been or will be incurred, regardless of when the act or acts causing or

---

[3] These lawsuits were filed in August and September of 2001. [Def.'s Ex. O.]

contributing to such loss occurred, even though the exact amount or details of loss may not then be known.

Discovery also occurs when the Insured receives notice of an actual or potential claim in which it is alleged that the Insured is liable to a third party under circumstances which, if true, would constitute a loss under this bond.

On March 4, 2003, after commencement of this lawsuit, plaintiff's counsel again wrote counsel for BancInsure, "We feel strongly that both the loan loss and the discovery of the same occurred during the period BancInsure issued their bond insuring North Alabama Bank against such loss." [Def.'s Ex. D.]

NAB initiated this action to recover under the separate Financial Institution Bonds issued by Travelers and BancInsure for losses it incurred on Steenson's fraudulently obtained loan. NAB contends in its Complaint that both Travelers and BancInsure, pursuant to the terms of their respective bonds, are liable for these losses. However, NAB and BancInsure entered into a *pro-tanto* settlement agreement by which BancInsure reimbursed NAB for the losses. On June 12, 2003, BancInsure was dismissed from this action with prejudice. [Doc. # 11.] The instant motion for summary judgment as to all of NAB's claims was filed on April 13, 2004.

III. STANDARD.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet his burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file," designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002)(quoting *Unites States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

IV.   DISCUSSION.

The sole issue in this case is whether NAB's discovery of its losses, within the meaning provided by Travelers' Financial Bond, occurred during the Bond period. NAB may recover from Travelers only if, during the Bond period, it became "aware of facts which would cause a reasonable person to assume that a loss of a type covered by this bond had been or will be incurred. . . ." The type of loss covered in the Travelers' Bond is "[l]oss resulting directly from dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others."

Neither side argues that former NAB employee, Bryant Hovis, committed "dishonest or fraudulent acts" in his involvement with the Steenson loan and check-kiting scheme. The area of disagreement, however, is the moment in time when NAB realized facts that would lead a reasonable person to assume a loss had been or would be incurred as a result of Hovis' fraudulent and dishonest actions.

NAB contends that it discovered the loan loss in December 1999, when it was required by the FDIC to charge off the Steenson loan due to problems with loan documentation. To support its claim, NAB offers deposition testimony of Al Smith, North Alabama Bank President. When Smith was asked whether, as of January 2001, he suspected that Hovis was guilty of dishonesty regarding the Steenson loan, he responded, "I had concerns."[4] [Smith Dep. at 85; Pl.'s Ex. 3 .] When asked if those concerns entailed Smith believing Hovis was "a crook," Smith responded, "I don't know that I thought he was a crook at that point. I had concerns." [Smith Dep. at 88; Def.'s Ex. E.] When Smith was asked whether, during the January 2001

---

[4]Smith issued a sworn affidavit on January 22, 2001, in a NAB lawsuit against Steenson to recover financial losses. [Def.'s Ex. J.] There is no mention in Smith's 2001 affidavit regarding Hovis' possible involvement.

Board meeting, he had formed the belief that Hovis "was guilty of criminal misconduct . . . while an employee of the bank," Smith responded, "No." [Smith Dep. at 96; Def.'s Ex. E.] Smith also testified that, as Bank President, had he suspected Hovis of criminal misconduct, he would have felt obligated to bring it to the Board of Directors' attention. [Smith Dep. at 93; Def.'s Ex. E.] However, Smith never informed the Board about his "concerns." [Smith Dep. at 94; Def.'s Ex. E.]

The court is of the opinion that although Smith knew that the loan had been charged off because of problems with the title applications and because of problems with the financial statements, it is clear that the information was insufficient to trigger "discovery" prior to the expiration of the bond period. It would not have "cause[d] a reasonable person to assume that a loss of a type covered by [the] bond had been or will be incurred." At most, the information demonstrated that Hovis violated NAB's Credit and Loan Policy and Procedures. It did not lead Smith, nor NAB for that matter, to believe Hovis was guilty of fraud or dishonesty regarding the Steenson loan.

Even if Smith had suspicions of dishonest conduct by Hovis, it is well settled that mere suspicion does not rise to the level of discovery. *See American Surety Co. v. Pauly*, 170 U.S. 133, 147 (1898) (The insured was required to give notice to the insurer once it "had knowledge — not simply suspicion — of the existence of such facts as would justify a careful and prudent man in charging another with fraud or dishonesty."); *See also F.D.I.C. v. Aetna Cas. & Sur. Co.*, 903 F.2d 1073, 1079 (6th Cir. 1990)("[D]iscovery of loss does not occur until the insured discovers facts showing that dishonest acts occurred and appreciates the significance of those facts; suspicion of loss is not enough." ); *See F.D.I.C. v. Oldenburg*, 34 F.3d 1529, 1542 (10th Cir. 1994) (noting that "[d]iscovery requires that the insured have more than 'mere suspicion' of loss."); *See Perkins v. Clinton State Bank*, 593 F.2d 327, 334 (8th Cir. 1979) (holding that mere suspicion does not constitute discovery).

Travelers' Bond "does not require that the bank have enough information to charge its employee with fraud or dishonesty. All that is required is that it have enough information to assume that the employee has acted fraudulently or dishonestly." *Royal Trust Bank, N.A. v. Nat'l Union*

*Fire Ins. Co. of Pittsburgh,* 788 F.2d 719, 721 n.2 (11th Cir. 1986). Traveler's Bond period expired on December 31, 1999, and as of then Smith did not possess "enough information to assume that the employee . . . acted fraudulently or dishonestly." Indeed, his own testimony reveals that these concerns did not cause him to believe, at that time, or even shortly thereafter, that Hovis was a "crook" or guilty of criminal misconduct.

In contrast, there is overwhelming evidence that NAB did not discover Hovis' involvement until well after Travelers' Bond had expired. In its application to BancInsure in January 2000 signed by NAB President Smith, NAB certified that no director or officer of the Bank had any knowledge of a pending loss or any information that could give rise to a claim under the Bond. On December 20, 2000, in its BancInsure Interim Anniversary Questionnaire, NAB stated that there was no situation not yet reported which could lead to a claim under the Bond.

In both January 2000, and January 2001, NAB's Board of Directors approved the re-appointment of Hovis as Vice President of NAB. Smith, NAB's President, testified that he would have informed the Board had he suspected Hovis had committed criminal activity. Hovis was never

disciplined for any criminal or dishonest activity while employed as Vice President at NAB. The first and only Suspicious Activity Report implicating Hovis in any criminal or dishonest activity was not issued until November 7, 2001, after Hovis' October 2001 resignation. Furthermore, this SAR made no mention of the Steenson loan.

On June 8, 2001, counsel for The Bank (another bank that suffered losses in the check-kiting scheme) wrote to Charles Gleghorn, CEO of North Alabama Bank, and stated that it had evidence that Bryant Hovis "knew of, facilitated, participated in, and/or benefitted from the check kite at least as early as January 1999." [Def.'s Ex. K.] In response to this letter, counsel for North Alabama Bank, with the approval of NAB President Smith, sent a letter dated June 28, 2001, stating:

> Of greater concern is the brazen statement in your letter that you have evidence that Bryant Hovis . . . knew of and participated in the check-kiting scheme as early as January, 1999. This statement is libelous per se and I hope for the sake of your firm and The Bank, it is backed up. . . . I would advise The Bank to proceed with caution as these individuals have not taken lightly these false statements made to their employer.

[Def.'s Ex. L.]

On August 16, 2001, BancInsure informed NAB that it believed NAB knew of the check-kite in August 1999, and therefore coverage may not exist. [Def.'s Ex. M.] NAB's counsel responded on August 28, 2001: "The fact that North Alabama Bank was aware of a check kite hardly lends itself to the conclusion that its officers or directors were in collusion with the wrongdoer thereby causing loss to a third party." [Def.'s Ex. N.]

The only evidence to support NAB's contention that they discovered Hovis' dishonest and fraudulent activity during Travelers' 1999 bond period is Smith's unvoiced "concerns" based on "problems" with the financial statements and "problems" with the title applications. As a matter of law, Smith's suspicions do not rise to the level of discovery. Without more, the court is of the opinion that the undisputed facts show that NAB's discovery did not occur during Travelers' 1999 bond period, thus entitling Travelers to summary judgment as a matter of law.

V.   CONCLUSION.

In sum, the court is of the opinion that the motion for summary judgment is due to be granted in all respects. The court will enter an appropriate order in conformity with this memorandum of opinion.

Done, this 26th of May, 2004.

                                              L. SCOTT COOGLER
                                         UNITED STATES DISTRICT JUDGE